J-S40015-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| v. | : | |
| JABREE EVANS | : | |
| Appellant | : | No. 593 EDA 2019 |

Appeal from the Judgment of Sentence Entered February 8, 2017
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-CR-0002726-2016

BEFORE:   SHOGAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 21, 2020**

Appellant, Jabree Evans, appeals *nunc pro tunc* from the judgment of sentence entered by the Court of Common Pleas of Delaware County on February 8, 2017.  We affirm.

Based upon an investigation by Tinicum Township Police, the Delaware County Narcotics Task Force ("Task Force") executed a search warrant at 1102 Thomas Street in Chester, Delaware County, on March 23, 2016, at approximately 2:30 p.m.  Appellant and his confederate, John Moreno, were present and standing in the kitchen at the top of the basement stairs when apprehended.  N.T., 12/14/16, at 23–25, 30–32, 65–67, 72, 81–82.

_____

[*] Retired Senior Judge assigned to the Superior Court.

From the basement steps, police seized ninety-two bags of heroin that were bound into seven bundles with black rubber bands packed in a rubber glove, and a Glock 23 firearm with eleven rounds and one in the chamber. A search of Appellant yielded two mobile telephones, $3,000 sorted by denomination, "stacked in individual thousand dollar stacks" bound with black rubber bands, and "$620 in another stack that was folded up" in Appellant's pocket. Moreno also possessed money, heroin, and mobile telephones in his pocket. N.T., 12/14/16, at 32–35.

Throughout the rest of the house, police found ammunition, new baggies, black rubber bands, $295, and $3,291, bound with the black rubber bands in $1,000 bundles. The search of Moreno's car yielded a loaded 9 mm Caltech firearm. The house was filthy with non-functional appliances and scarce furnishings. Dog feces suggested a dog was kept in the basement. The search yielded no evidence of drug use. N.T. 12/14/16, 35-38, 49, 55–56, 95, 109.

Appellant proceeded to a jury trial on December 14, 2016. The jury found Appellant guilty of persons not to possess firearms, firearms not to be carried without a license, and conspiracy to manufacture, deliver, or possess with intent to manufacture or deliver a controlled substance.[1] The jury acquitted Appellant of manufacture, delivery, or possession with intent to

---

[1] 18 Pa.C.S. §§ 6105, 6106(A)(1), 903, and 35 P.S. § 780-113(a)(30).

manufacturer or deliver a controlled substance. The trial court imposed an aggregate sentence of imprisonment of ninety to 180 months.

Appellant filed an untimely motion to reconsider sentence that was denied on January 4, 2019. Appellant filed a *pro se* petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546, and counsel was appointed, who filed an amended petition. On January 22, 2019, the trial court granted the PCRA petition and reinstated Appellant's direct-appeal rights *nunc pro tunc*. Appellant filed a timely notice of appeal on February 21, 2019.

Appellant raises the following issues on appeal:

Whether the evidence was insufficient to sustain the conviction of Persons not to possess, use, manufacture, control, sell or transfer firearms because the Commonwealth failed to prove beyond a reasonable doubt that Appellant possessed firearms?

Whether the evidence was insufficient to sustain the conviction of Persons not to possess, use, manufacture, control, sell or transfer firearms because the Commonwealth failed to prove beyond a reasonable doubt that Appellant controlled firearms?

Whether the evidence was insufficient to sustain the conviction of Firearms not to be carried without a license because the Commonwealth failed to prove beyond a reasonable doubt that Appellant carried a firearm in any vehicle without a valid and lawfully issued license?

Whether the evidence was insufficient to sustain the conviction of Firearms not to be carried without a license because the Commonwealth failed to prove beyond a reasonable doubt that Appellant carried a firearm concealed on or about his person without a valid and lawfully issued license?

Whether the evidence was insufficient to sustain the conviction of Firearms not to be carried without a license because the Commonwealth failed to prove beyond a reasonable doubt that

1102 Thomas Street, Chester, Pennsylvania was not Appellant's place of abode?

Whether the evidence was insufficient to sustain the conviction of Firearms not to be carried without a license because the Commonwealth failed to prove beyond a reasonable doubt that 1102 Thomas Street, Chester, Pennsylvania was not Appellant's fixed place of business?

Whether the evidence was insufficient to sustain the conviction of Conspiracy with another to Possess a controlled substance with the intent to deliver because the Commonwealth failed to prove beyond a reasonable doubt that Appellant intended to promote or facilitate the crime's commission?

Whether the evidence was insufficient to sustain the conviction of Conspiracy with another to Possess a controlled substance with the intent to deliver because the Commonwealth failed to prove beyond a reasonable doubt that Appellant agreed with others that they or one or more of them would commit, attempt or solicit the crime?

Whether the evidence was insufficient to sustain the conviction of Conspiracy with another to Possess a controlled substance with the intent to deliver because the Commonwealth failed to prove beyond a reasonable doubt that Appellant agreed to aid another in planning, committing, attempting or soliciting the crime?

Appellant's Brief at 6–8.

Despite his delineation of nine issues in his brief on appeal, Appellant presents two brief arguments in violation of Pa.R.A.P. 2119, which provides, "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). Although Appellant's organization of his argument does not

correspond with the issues presented and does not facilitate our review, it does not impair our review to the extent that we would decline to address the issues on this basis.

First, however, we observe that Appellant begins his argument with a claim that was not presented in his statement pursuant to Pa.R.A.P. 1925(b) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived") and was not included in Appellant's statement of questions involved pursuant to Pa.R.A.P. 2116 ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). He suggests, inartfully, that there was a mistaken statute citation in the Information filed against him. Appellant's Brief at 15. While he attempts to claim its preservation by suggesting it is an issue relating to an illegal sentence,[2] without any support, *id.* at 16, his description of the issue proves otherwise. *Id.* at 15. Rather, Appellant states that the Bill of Information is defective, asserting that he was entitled to "accurate notice" of the charge against him. *Id.* Thus, the issue is waived. Pa.R.A.P. 1925; Pa.R.A.P. 2116.

Even if not waived, the claim lacks merit. Appellant notes that the body of the Bill of Information accurately describes the charge under 18 Pa.C.S. §

---

[2] As we stated in **Commonwealth v. Robinson**, 931 A.2d 15, 21 (Pa. Super. 2007) (*en banc*), "[W]e have established the principle that 'the term "illegal sentence" is a term of art that our Courts apply narrowly, to a relatively small class of cases.'"

- 5 -

6105(a)(1), for which he was found guilty and sentenced; however, the statute is erroneously cited in the Bill of Information as 18 Pa.C.S. § 6105(a)(2)(i). Thus, Appellant contends that this citation error renders the Bill of Information defective, resulting in an illegal sentence on this charge.

Pennsylvania Rule of Criminal Procedure 560 provides, in pertinent part, that the Bill of Information shall contain "a plain and concise statement of the essential elements of the offense substantially the same as or cognate to the offense alleged in the complaint[.]" Pa.R.Crim.P. 560(B)(5); **see also Commonwealth v. Weigle**, 997 A.2d 306, 312 (Pa. 2010). While Rule 560 provides that a Bill of Information shall include "the official or customary citation of the statute and section thereof, or other provision of law that the defendant is alleged therein to have violated[,]" Pa.R.Crim.P. 560(C), it also states that "**the omission of or error in such citation shall not affect the validity or sufficiency of the information**." **Id.** (emphasis added).

The Information for the charge of Persons Not to Possess Firearms, states as follows:

COUNT 4: Person Not To Possess Use, Etc. Firearms–(F2)

Offense Date: 03/23/2016  18 § 6105 §§ A2i

The District Attorney of Delaware County by this information charges that on (or about) 11-16-2012, in said County JABREE EVANS defendant, having been convicted of a certain crime to wit: DELIVERY MANUFACTURE A CONTROLLED SUBSTANCE before the Honorable GREGORY MALLON, Judge of Common Pleas Court of the County of and was thereupon sentenced to 9-23 MONTHS PRISON, as a Bill of Information Number 12-6593 AND THAT THEREAFTER, to wit: on 3/23/2016 in Delaware County, JABREE

- 6 -

> EVANS, defendant, unlawfully did then and there own or have in his possession and under his control a certain firearm, to wit: GLOCK 23 40 CAL FIREARM, contrary to the Act of the General Assembly in such case made and provided, and against the peace and dignity of the Commonwealth of Pennsylvania.

Information, **Commonwealth v. Evans**, Docket No.: CP-23CR-0002726-2016. The Information is not defective, nor does the record reflect any confusion about the nature of the charges filed against Appellant. Thus, notwithstanding the citation error, the Information provides no grounds to vacate the sentence. Therefore, if the issue were not waived, we would conclude it lacks merit.

Appellant's final issues argue that his convictions are against the sufficiency of the evidence. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. **Commonwealth v. Green**, 203 A.3d 250, 253 (Pa. Super. 2019), *appeal denied*, 216 A.3d 1036, 54 WAL 2019 (Pa. July 30, 2019). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." **Commonwealth v. Colon-Plaza**, 136 A.3d 521, 525–526 (Pa. Super. 2016) (quoting **Commonwealth v. Robertson-Dewar**, 829 A.2d 1207, 1211 (Pa. Super. 2003)). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or

none of the evidence. ***Commonwealth v. Tejada***, 107 A.3d 788, 792–793 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. ***Commonwealth v. Mucci***, 143 A.3d 399, 409 (Pa. Super. 2016). Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. ***Commonwealth v. Rogal***, 120 A.3d 994 (Pa. Super. 2015).

We have considered the arguments of the parties, the relevant law, and the complete record. The trial court conducted a thorough review of the evidence presented, described its relevance to Appellant's convictions, and correctly concluded that Appellant's issues lack merit. Thus, we rely upon the trial court's July 18, 2019 opinion in affirming the judgment of sentence. In the event of future proceedings, the parties are directed to attach a copy of the trial court's opinion.

Judgment of sentence affirmed.

Judge Colins joins this Memorandum.

Judge King concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/21/20

- 8 -

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY,
COMMONWEALTH OF PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA      :      NO.: CP-23-CR-2726-2016

                          NO.: CP-23-CR-3693-2016[1]

v.      :

JABREE EVANS      :      593 EDA 2019

## OPINION

Hon. Richard M. Cappelli                   July 18, 2019 ✓

Appellant, Jabree Evans, appeals from his *February 8, 2017* Judgment of Sentence.

The charges at *CP-23-CR-No. 2726-16* against the Appellant, Jabree Evans, arise out of the execution of a search warrant by officers of the Delaware County Narcotics Task Force at 1102 Thomas Street in Chester, Delaware County on Wednesday *March 23, 2016* at approximately 2:30 pm. As a result, the Appellant, Jabree Evans, was charged with illegal drug manufacture and delivery as well as the

---

[1] On case No. *CP-23-CR-3693-2016* the Appellant received the following sentence:

| Charge | Grading | Statute/Crimes Code | Sentence |
|---|---|---|---|
| | | | |
| Receiving Stolen Property | F3 | 18§3925§§A | 15 to 30 Months incarceration[1] |

To run concurrent to his sentence at 2726-2016.

illegal possession of drugs, drug paraphernalia and charges related to illegal firearms possession.[2]

On case No. *CP-23-CR-2726-2016* the Appellant received **the following** sentence on February 8, 2017:

| Charge | Grading | Statute/Crimes Code | Sentence |
|---|---|---|---|
| | | | |
| Person not to Possess a Firearm | F2 | 18 §6105 A(2)(i) | 60 to 120 months incarceration |
| Conspiracy to PWID w/John Moreno | UF | 18 §903 | 30 to 60 months consecutive incarceration |
| Firearms not to be carried without a license | F3 | 18 §6106 §§A1 | 42 to 84 months concurrent incarceration[3] |

It is from *this February 8, 2018* Judgment of Sentence that Appellant appeals contending reversible error on the following grounds:

(1) Insufficiency of the *evidence of Appellant's possession of a firearm* to sustain his conviction for Persons Not to Possess firearms;

(2) Insufficiency of the *evidence of Appellant's "control of a firearm"* to sustain his conviction for Persons Not to Possess firearms;

---

[2] **Charges included:** Possession with the intent to manufacture and/or deliver heroin; Conspiracy to manufacture or manufacture and/or deliver heroin; Possession of heroin; Possession of drug paraphernalia; (clear plastic bags);Possession of a firearm without a license; Unlawfully Possessing a firearm;

[3] *Additional Conditions*: Comply with Rules of Probation and Parole, pay cost assessment, submit to DNA testing, pay lab fee, and forfeit property, not RRRI eligible, Not Boot Camp Eligible with credit for time served.

2

(3) Insufficiency of the *evidence of Appellant's carrying of a firearm in any vehicle* without a valid license to sustain his conviction for Firearms not to be carried without a license;

(4) Insufficiency of the *evidence of Appellant's carrying of a firearm on his person* without a valid license to sustain his conviction for firearms not to be carried without a license;

(5) Insufficiency of the *evidence that 1102 Thomas Street Chester, Pennsylvania was not Appellant's abode* such that evidence was insufficient to sustain his conviction of firearms not to be carried without a license;

(6) Insufficiency of the *evidence that 1102 Thomas Street, Chester, Pennsylvania was not Appellant's fixed place of business* such that evidence was insufficient to sustain his conviction of Firearms not to be carried without a license;

(7) Insufficiency of the *evidence of the Appellant's promotion of or facilitation* of Conspiracy to Possess a Controlled Substance With the Intent to Deliver (PWID) with another person to sustain his conviction for Conspiracy to PWID;

(8) Insufficiency of the *evidence of the Appellant's agreement with others* to sustain his conviction for Conspiracy to PWID;

(9) Insufficiency of the *evidence of the Appellant's agreement with another to aid in the planning, committing, attempting or soliciting* the crime to sustain his conviction for Conspiracy to PWID;

The Appellant's appeal lacks legal merit, Judgment of Sentence should be affirmed.

The Controlled Substance, Drug, Device and Cosmetic Act defines PWID, in relevant part, as follows: *§ 780-113.* Prohibited acts; penalties (a) The following acts and the causing thereof within the Commonwealth are hereby prohibited: * * * (30)

3

Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance. * * * *35 P.S. § 780-113(a)(30).*

Thus, "[t]o establish the offense of possession of a controlled substance with intent to deliver, the Commonwealth must prove beyond a reasonable doubt that the defendant possessed a controlled substance with the intent to deliver it." *Commonwealth v. Perez*, 931 A.2d 703, 707-08 (Pa. Super. 2007). The Commonwealth can establish the identity of the controlled substance at trial by circumstantial evidence. *Commonwealth v. Rickabaugh*, 706 A.2d 826, 844 (Pa. Super. 1997), appeal denied, 558 Pa. 607, 736 A.2d 603 (1999).

*See also Commonwealth v. Bricker*, 882 A.2d 1008, 1015 (Pa. Super. 2005) (holding Commonwealth can establish all elements of PWID by circumstantial evidence). "Factors to consider in determining whether the drugs were possessed with the intent to deliver include the particular method of packaging, the form of the drug, and the behavior of the defendant." *Commonwealth v. Kirkland*, 831 A.2d 607, 611 (Pa. Super. 2003), *appeal denied*, 577 Pa. 712, 847 A.2d 1280 (2004).

4

The standard of review for a challenge to the sufficiency of the evidence is well-settled:

> In reviewing sufficiency of evidence claims, the Pennsylvania Superior Court must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all the elements of the offense. Additionally, to sustain a conviction, the facts and circumstances which the Commonwealth must prove, must be such that every essential element of the crime is established beyond a reasonable doubt. Admittedly, guilt must be based on facts and conditions proved, and not on suspicion or surmise.

> Entirely circumstantial evidence is sufficient so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The fact finder is free to believe all, part, or none of the evidence presented at trial. *Commonwealth v. Moreno*, 14 A.3d 133, 136 (Pa. Super. 2011), appeal denied, 44 A.3d 1161 (Pa. 2012).

The record of the jury trial in this matter reveals that the Commonwealth presented a clear, compelling and succinct case for the Appellant's guilt and convictions.

The Commonwealth elicited testimony from skilled drug interdiction law enforcement officers[4] who appeared to be expertly trained, experienced and knowledgeable of the ways of illegal drug trafficking. The Commonwealth

---

[4] Officer Kevin Wiley, Tinicum Township Police Department, Kevin Gaul, Tinicum Township Police Department, Steven Bannar, Delaware County Criminal Investigation Division, Narcotics and Timonth Gavel of the Pennsylvania State Police DNA Laboratory.

5

presented a highly cogent theory of the case against the Appellant woven together from the direct observations of the officers, the totality of the circumstances they found upon executing a search warrant and presented to the jury 92 bags of heroin, *stamped* ("Need for Speed") in bags and bundles that are typically utilized for illegal heroin distribution, thousands of dollars in U.S. currency folded and banded in the very same bands that the seized heroin bundles were wrapped. Over three thousand dollars on the person of the Appellant at the time of his arrest.

The Delaware County Narcotics Task force team engaged in what appeared at trial to be a text-book illegal drug supply interdiction operation utilizing confidential informants, surveillance, controlled purchases of heroin, a Constitutionally compliant duly authorized search warrant, and a "boots on the ground" operation to surround the target "trap house" properly from which the heroin was being sold and distributed, and captured the distributors and related tools of their heroin dealing trade including weapons, cash and packaging and bundled branded heroin stamped "Need for Speed".

At trial, the Commonwealth presented the testimony of the Officers Wiley, Gaul, Bannar and the Pennsylvania State Police DNA laboratory expert Timothy Gavel. Additionally, the Commonwealth introduced and entered the actual physical evidence into the record, including: search warrant; Caltech 9mm handgun; photograph of a handgun in the console of a vehicle; ammunition in a gun magazine;

6

"apple" baggies; black rubber bands; clear plastic glove; 92 bags of heroin; Glock 23, firearm; 11 rounds 40 caliber ammunition; photo of the Glock on the basement floor; photograph of the U.S. currency in the bedroom; photograph of the U.S. currency in the bedroom closet; 2 cell phones. Various factual and legal stipulations were read to the jury.

Review of the pertinent trial record reveals the following:

a. *The Testimony of Officer Kevin Wiley of the Tinicum Township Police Department*

Officer Wiley testified that at or about 2:30 p.m. on March 23, 2016 while armed with a valid search, after receiving no response to the police knock and announce, the members of the Delaware County Narcotics Task Force team utilizing a ram rod ("the door guys") crashed through the front door of 1102 Thomas Street through which Officer Wiley was the first to run through into the small row home residence followed by other members of the Narcotics Task Force team. *(See, N.T., TRIAL, 12/14/16, pp. 24-32).* Officer Wiley explained that two groups races into the home, one heading up to the second floor to make it safe and clear for other officers to conduct their search. *Id.*

Officer Wiley testified that after he made entry through the front door he was able to see straight through to the kitchen at the back of the house where he observed

7

the Appellant along with another person standing against the wall next to the entrance to the cellar door trying to stand out of direct view. *Id.* at 31.

Once the Appellant and the other person (John Moreno)[5] were secured, the search of the premises continued. Officers went to the cellar area and discovered: the 92 heroin bags packaged up, banded into 7 bundles and stuffed in a rubber glove; the Glock 23 9 mm handgun loaded with 11 rounds and one round chambered. *Id.* at 33.

A search of Moreno's person turned up money, four bags of heroin in his pants pocket, and two cell phones. *Id.* at 35. In Appellant's pants pocket Three Thousand Six Hundred and Twenty Dollars ($3,620.00) in U.S. currency separated and banded with the same bands used to bundle the heroin turned up the search of his person. *Id.*

A search of the second floor turned up two hundred ninety five dollars ($295.00) and brand new apple baggies in the front bedroom. *Id.* at 36. A search of the back bedroom turned up Three Thousand Two Hundred Dollars ($3,200.00) stacked and bound and banded in the same "heroin bands" in Thousand Dollar increments.

---

[5] The Commonwealth's theory of the case was that Moreno was a lower level street dealer supplied by Appellant who occupied a higher level (possessing and packaging larger quantities for distribution and sale) in the heroin distribution scheme.

8

A search of the vehicle[6] identified in the search warrant turned up another handgun in the console, that is, a Caltech 9 mm. *Id.* at 36-43.

Officer Wiley identified the all of the evidence of the heroin distribution conspiracy that he and the Narcotics Task Force exposed on March 23, 2016 being conducted by the Appellant at 1102 Thomas Street Chester, Pennsylvania. He identified all of the weapons and currency and packaging and heroin including the stamped "Need for Speed" bundles and black rubber bands.

Officer Wiley testified that based on his experience, training and background, the heroin found was packaged in a manner commonly used for sale and distribution. *Id.* at 45. He also identified the loaded Glock 23 40 cal. firearm with one live round chambered and eleven additional rounds[7] in the magazine that was found on the floor at the bottom of the cellar stairs in plain view. *Id.* at 46.

Officer Wiley also testified that the basement or "cellar" was disgusting with dog feces piled all around (a pit bull dog was living in those conditions) and a disconnected washer and dryer set was not hooked up to any utility. *Id.* **at 49.** Officer Wiley noted that the Glock 23 handgun was essentially clean but for a scuff mark from striking the ground. *Id.*

---

[6] Officer Wiley testified that John Moreno had been surveilled operating the Chevrolet Malibu. *Id. at 40.*

[7] Testimony was elicited indicating these were exploding "hollow point" rounds designed to cause extra damage on impact.

9

Evidence including testimony, physical evidence actually seized at the scene was presented to the jury including photographs of the scene and the actual items seized. *Id.* at 52. The Commonwealth elicited that the money found in the upstairs closet was bundled and banded in the same manner as the money found on the Appellant's person. *Id.* at 56. Cross-Examination did little to impugn Officer Wiley's clear and candid testimony. *Id.* at 56-59.

At the scene, a buccal swab of the inside of the Appellant's cheek was obtained from the Appellant for purposes of matching his DNA with any DNA on the Glock 23 40 caliber handgun. *Id.* at 58-59. The parties also stipulated to the chain of custody of the Glock and the bullets and entered their stipulation on the record to the jury. *Id.* at 60. The Commonwealth and the Appellant stipulated that the Appellant did not possess any valid firearms license as of March 23, 2016. *Id.* at 60-61. The Commonwealth and the Appellant also stipulated that on March 29, 2016 and April 22, 2016 the DNA samples were taken from the Glock 23 handgun and John Moreno and the proper chain of custody of those samples respecting the testing of all the samples at the Pennsylvania State Police DNA laboratory. *Id* at 62-63.

*b. Testimony of Officer Kevin Gaul of the Tinicum Township Police Department*

Officer Gaul has been a police officer for fifteen years. Presently he has been assigned to the Delaware County Narcotics Task Force for approximately a year and a half. Over his career he describes attending multiple narcotics and drug enforcement training provided by the Pennsylvania State Police.

Officer Gaul has worked with drug enforcement investigations along with the Pennsylvania State Police. He has been trained by both the Arizona and California High Patrol in narcotics trafficking interdiction. He also belongs to the Southeastern Pennsylvania Criminal Investigation Group which is a professional association among members of the Federal Drug Enforcement Agency and local law enforcement who meet monthly to discuss the developing and evolving trends in narcotics trafficking and undercover interdiction techniques. He also is regularly involved in training in undercover narcotics operations. *Id.* at 75-76. He routinely prepares and executes drug search warrants as well as making drug related arrests. *Id.* at 78.

On March 23, 2016 he was a member of the team serving and executing the search warrant at the 1102 Thomas Street row home in the Summerville section of the Chester, Delaware County. Officer Gaul explained that the team of narcotics officers split into two groups as they approached the residence located at 1102 Thomas Street. One team performs the knock and announce and the second group

11

covers the rear door to reign in and cover any persons inside who attempt to flee out the back door.

Officer Gaul along with other team members covering the rear door took up positions along the edge of the property from where they could observe and cover the back door of the residence. Officer Gaul could hear the "knock and announce" team.[8] At that time Officer Gaul observed two occupants attempt to flee out the back door but when they encountered Officer Gaul and the members of his team yelling "police, stop" the two occupants quickly slammed the back door and retreated inside the row house. *Id.* at 81. Officer Gaul was able to identify the Appellant as one of the persons attempting to flee out the back door after the "knock and announce". *Id.*

Officer Gaul observed that the back door was immediately in front of the basement stairway separated by approximately three feet. *Id.* at 83. The Appellant was apprehended in this space. *Id.* Cross examination did not significantly undermine Officer Gaul's testimony. *Id.* at 83-89.

c.   *Testimony of Detective Steve Bannar of the Delaware County District Attorney's Office Criminal Investigation Division*

Detective Bannar is a sixteen (16) year law enforcement veteran with seven years narcotics investigation experience. He has been a Narcotics Instructor for ten

---

[8] Officer Gaul testified he heard the officers of the front door team repeatedly knocking and yelling "police..search warrant..open up". *Id.* at 81.

years at the Delaware County Police Academy. He is a graduate of the DEA's narcotics school and the FBI narcotics detective training school. He has graduated from the Top Gun narcotics training school and he fulfills his annual training and education requirements with education related to illegal drug interdiction including the heroin epidemic, pills and other controlled substances, and related illegal distribution. *Id.* at 92.

Detective Bannar has investigated, seized, purchased, and tested controlled substances such as heroin on thousands of occasions. He has prepared and executed hundreds of search warrants related to illegal drug interdiction. He is well aware of the paraphernalia[9] and operations of illegal drug manufacture and distribution and the sale there of. *Id.* at 92-95.

Detective Bannar explains that the evidence demonstrates the heroin is in a wax bag (.03 grams), packaged in a clear bag. He testified that in a distribution operation you are going to find bundles of these wax bags containing the heroin typically 12 to 14 separate wax bags inside a clear plastic baggie. He also testified there would typically be a stamp or label of some kind identifying the producer. And the bundles are banded together by "tiny tiny" rubber bands. *Id.* at 96.[10]

---

[9] Detective Bannar explains that with users, verses distributors and sellers, you are going to find needles or a straw every time. *Id.* at 95.

[10] The tiny rubber bands are typically black, pink and purple. *Id.*

Also, Detective Bannar testified that if you are going to a property where you are buying heroin, there usually is protection including a pit bull dog and/or firearms. *Id.* Detective Bannar also testified you are not typically going to find too much paraphernalia related to actually ingesting the heroin because larger possessors, producers and distributor of heroin do not actually use the heroin themselves. *Id.*[11]

Detective Bannar's testimony was particularly compelling. He testified that that heroin and narcotics traffickers use their own counter-measures to detect undercover operatives such as himself by providing counterfeit heroin to see if the purchaser returns claiming the product was excellent or good all the while knowing that a counterfeit was sold. He also testified that the number of abusers is so great that dealers actually lose track of their customers such that the undercover detective can gain access to a supplier/seller because the seller/supplier simply presumes he has sold to the person on a prior occasion. Detective Bannar testified that as in Appellant's case he routinely utilizes information from heroin abusers and confidential informants to make controlled heroin purchases utilizing pre-marked money. *Id.* at 97-98.[12]

---

[11] Detective Bannar testified one bag can kill you, that is, one 30 milligram wax bag is potentially lethal. "So they typically don't use their own product". *Id.* at 97.

[12] To underscore the pervasiveness of the heroin epidemic, Detective Bannar testified that he can dress up in a ridiculous outfit to appear as a heroin abuser and within five (5) minutes of walking around the City of Chester find a heroin seller. *Id.* at 98.

14

Detective Bannar testified to these additional pertinent qualifications:

He is routinely contacted by other members of law enforcement for his opinions regarding the packaging of illegal controlled substances in furtherance of determining whether the manner of packaging is sufficient indicia of the intent to distribute or indicative of personal use; *Id.* at 99. He is sufficiently familiar with the manner of/and preparation, cost(s), packaging, appearance, consistency, sale and the weights of which heroin is distributed. *Id.* He is absolutely familiar with the manner in which sellers of heroin purchase, package, store, protect, sell and deliver these drugs in the City of Chester, Delaware County. *Id.* at 99.

Detective Bannar was qualified as an expert in illegal drug trafficking, drug investigations and generally in the field of illegal drugs. *Id.* at 100. He testified that there is a hierarchy, that is, a vertical organization chart that can be drawn based on quantities of heroin being sold, such that, where anyone ranks depends on the quantity of heroin they purchase and/or re-sell. *Id.* at 101. He testified that the large sums of money from heroin comes from the abusers who need the product and will do anything to get money to buy heroin once addicted to it.

Additionally, as the kilo quantities are passed down through the distribution chain the heroin gets "stepped on", that is, diluted just like cutting a full bottle of whiskey into four bottles by pouring off and adding different liquids. He also

15

testified to the violence involved and the fact that guns are rampantly used by dealers in the protection of their extremely valuable heroin dealing (4.3 grams estimated to be worth $1,000). *Id.* at 103-104.

Detective Bannar testified that these dealers will sometimes utilize an abandoned home for dealing or rent a property where persons live and carry out their illegal drug sales in the midst of the residence. When showed the 92 bags of heroin recovered in the instant case, Detective Bannar emphatically testified that it was not a quantity associated with personal use. He also explained that the "apple bags" which are legally intended for coin collections are cross-purposed for bagging cocaine, heroin, crystal methamphetamine, and marijuana. Detective Bannar also testified to the use of the "tiny" rubber bands to bind 12-14 heroin bags to make a bundle. *Id.*

Ultimately, Detective Bannar rendered his opinion that the drugs and weapons and paraphernalia in this case all lead to the conclusion that this was a heroin distribution operation. *Id.* at 108.

Detective Bannar testified to the basis of his opinion as follows:

The quantity itself is far beyond the amount used daily by abusers. *Id.* at 109. Users keep the heroin on their person. "A user doesn't have 92 bags on his person, a dealer does". *Id.* If the Appellant was a user there would be evidence of use scattered about including needles and straws. Also the quantity of money is indicative of selling. Detective Bannar testified "you don't have to be an expert to understand. No one has $3,600.00 in their pocket, right. I don't." *Id.* at 110.

16

*d.*    *Testimony of Timothy Gavel of the Pennsylvania State Police DNA Laboratory*

Mr. Gavel holds an undergraduate degree in Biology and General Science Education with course work in human genetics. He has received training on population statistics as it applies to forensic DNA analysis at the State Police DNA Laboratory. He has two years' experience as a research specialist at the University of Pittsburgh in the Department of Pathology specializing in prostate cancer research. *Id.* at 115.

Mr. Gavel works at the State Police DNA Laboratory performing DNA analysis on case work samples. In addition, he performs technical reviews of DNA case records and quality control as assigned. *Id.* at 116. Mr. Gavel has previously been qualified as an expert in court in 33 counties across Pennsylvania including Delaware County two prior occasions. He has also testified in Federal Court. *Id.*

Mr. Gavel was asked to explain DNA evidence.[13] Essentially, DNA samples are compared for similarity between a "known" subject and a "Q" sample for which

---

[13] Mr. Gavel testified that DNA is found in chromosomes which are found in the nucleus or "control center" of the cell. He explained that DNA is the genetic blue print for our bodies. He described it as a tiny instruction manual inside our cells. DNA tells us how our body works and looks. All the physical traits of an individual such as hair color, eye color, height, and gender as well as all the chemical characteristics are determined by an individual's DNA. *Id.* at *117.* He explained our bodies have 23 pairs and are inherited from our mother and father variously. DNA is found in every cell in the human body except red blood cells. *Id.* He explained that DNA research has shown that certain areas of our DNA vary greatly between individuals with the exception being identical twins. *Id.* at 177.

17

there is a question whether the known subject's DNA appears on the item of evidence, hence, the "Q (question) sample". *Id.* at 118. The test compares 24 areas on the DNA which are locations known to show differences from person to person. The combined results of those 24 areas are referred to as the "DNA profile". *Id.* at 118. The *DNA* profiles of the question items are compared to the *DNA* profiles of the known items. If the *DNA* profile of a question item and that of a known item are the same we determine that those profiles match. If a match is declared, a statistical calculation is applied to determine how common or how rare that profile is in our population. *Id.* at 118-119.

Mr. Gavel explained that he compared the DNA profiles from the Glock (Q-1) to DNA profiles collected from the Appellant (K-1) and his co-conspirator, John Moreno (K-2). He explained that the first test did not yield sufficient genetic material to perform the DNA test on the Glock. *Id. at 121*.

Mr. Gavel further testified there is a secondary test that is done which looks only at the "Y" chromosome which is present only in male individuals. Using the secondary test, Mr. Gavel was able to develop three partial DNA profiles from the Glock 23 40 caliber handgun. Mr. Gavel's supporting DNA evidence is, first, there was sufficient genetic material or DNA to make an interpretation. *Id. at 122*. Second Mr. Gavel opined that it was sufficient genetic material and that most of the DNA came from one person, that is, Jabree Evans. The import of the DNA testimony is

18

that not only did it implicate Appellant, Jabree Evans but tended to exonerate the co-conspirator, John Moreno, because none of the genetic material could be matched with his DNA profile which undermined the Appellant's "wrong place, wrong time" defense. At the close of the testimony of Mr. Gavel, the Commonwealth rested, and the trial concluded.

e. *Stipulations*[14]

i. The Appellant stipulated that the Appellant was convicted on *November 26, 2012* of Title XXXV, *Section 780-113, Subsection A30, possession with intent to deliver*, an ungraded felony under transcript *CP-23-CR-6593-2012* and that the Appellant was convicted on *January 29, 2013* of Title XXXV, *Section 780-113, Subsection A30, possession with intent to deliver*, an ungraded felony.

ii. The Appellant stipulated that his prior PWID convictions were enumerated offenses under Title XXXV, Section 6105, Subsection A1, persons not possess, use, manufacture, control, sell or transfer firearms. *See Id.* at 176.[15]

iii. The Appellant stipulated that on March 23, 2016 he did not have a valid license to carry a firearm issued under the provision of 6109 of the crimes code. The Appellant further stipulated that on March 23, 2016 he did not have a valid sportsman firearm permit issued under the provisions of Section 6106C of the crimes code.[16]

---

[14] Other Stipulations were read into the record that are not pertinent to the disposition of this Appeal.

[15] The significance of the stipulation is that if convicted of possessing a firearm he was further guilty of possessing, using, controlling or transferring a firearm because he had been convicted of an enumerated offense.

[16] This stipulation appears to refer to the Pennsylvania Sportsman's Permit: An individual who is age 18 or older and is licensed to hunt, trap or fish, or who has been issued a permit relating to hunting dogs, may apply for a Sportsman's Firearm Permit by submitting a completed application along with the required fee to the county treasurer's office. The permit shall be issued immediately

I.      Appellant's challenge to the sufficiency of his conviction for carrying a firearm without a license lacks legal merit and judgment of conviction should be affirmed.

Appellant's challenges to the sufficiency of the evidence of carrying a firearm without a license are devoid of merit when considered against the jury's verdict in light of all of the evidence presented at trial. Appellant challenges sufficiency of the carrying a firearm without a license conviction the following grounds:

(1) Insufficiency of the *evidence of Appellant's possession of a firearm* to sustain his conviction for Persons Not to Possess firearms;

(2) Insufficiency of the *evidence of Appellant's "control of a firearm"* to sustain his conviction for Persons Not to Possess firearms;

(3) Insufficiency of the *evidence of Appellant's carrying of a firearm in any vehicle* without a valid license to sustain his conviction for Firearms not to be carried without a license;

(4) Insufficiency of the *evidence of Appellant's carrying of a firearm on his person* without a valid license to sustain his conviction for firearms not to be carried without a license;

(5) Insufficiency of the *evidence that 1102 Thomas Street Chester, Pennsylvania was not Appellant's abode* such that evidence was insufficient to sustain his conviction of firearms not to be carried without a license;

and be valid throughout this Commonwealth for a period of five years from the date of issue for any "legal firearm", when carried in conjunction with a valid hunting, furtaking or fishing license, or permit relating to hunting dogs. The issuances of a Sportsman's Firearm Permit allows the individual to carry a firearm if such persons are actually hunting, taking furbearers, fishing or training dogs, or are going to the places where they desire to hunt, take furbearers, fish, or train dogs during the regular training season, or returning from such places. A Sportsman's Firearm Permit is not a License to Carry a firearm concealed.

20 .

(6) Insufficiency of the *evidence that 1102 Thomas Street, Chester, Pennsylvania was not Appellant's fixed place of business* such that evidence was insufficient to sustain his conviction of Firearms not to be carried without a license;

Appellant's first six (6) challenges to his conviction center on the conviction for carrying a firearm without a license. Variously, the Appellant attacks the sufficiency of the evidence that Appellant *"possessed"* the Glock 23 handgun, the sufficiency of the evidence of the Appellant's *"control"* of the Glock 23 handgun, the sufficiency of the evidence of the Appellant's *carrying the handgun in any vehicle*,[17] the sufficiency of the Appellant's carrying a firearm on his person, the sufficiency of the evidence that 1102 Thomas Street was not Appellant's place of abode or place of business.

The Commonwealth's theory *(N.T., 12/14/16, p.145)* as to Appellant's illegal carrying and possession of the Glock 23 firearm found in the basement at 1102 Thomas Street is that he was carrying the gun on his person just before the warrant was executed and then took *his* handgun (the Glock 23 firearm) which he was carrying on his person and *his* heroin (92 bundled bags stuffed in a rubber glove) and threw them down the basement stairs[18] as the Drug Task Force performed their knock and announce and as they crashed through the front door of 1102 Thomas

---

[17] There was no evidence the Glock 23 handgun was carried in a vehicle.

[18] The Commonwealth produced evidence of skid markings on the floor of the basement where the Glock 23 handgun purportedly struck the ground after being thrown down the basement steps. The basement was deplorable with dog feces littered all around but the Glock 23 was described as "clean" but for the skid mark evidence.

21

Street, Chester, Delaware County. There was evidence that the Appellant was observed along with his co-conspirator attempting to flee through the back door of the premises before realizing that law enforcement had that escape route covered. Important to note, the back door is in proximity to the basement or cellar door where the Appellant was discovered by Officer Wiley attempting to conceal himself.

Officer Wiley testified he had a straight line of sight to the kitchen and back door after breaching the front door of the small row home. There was also testimony that the premises was not a place of abode but a heroin "trap" house and the basement floor was littered with dog feces and the washer and dryer were not hooked-up to any utility for routine or regular use. Adding to that, the jury heard the expert DNA testimony connecting the Glock 23 handgun to matching the Appellant's DNA and excluding the co-conspirator, John Moreno. The illegal heroin operation testimony elicited from the Commonwealth's expert made clear that the premises was being used for the heroin enterprise not as "an abode" or "place of business".

The Pennsylvania Superior Court applies the following standard of review to challenges to the sufficiency of the evidence:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not

22

preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Gonzalez*, 109 A.3d 711, 716 (Pa.Super.2015). A person is guilty of carrying a firearm without a license "if he carries a firearm in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license." *18 Pa.C.S. § 6106(a)(1)*. The Commonwealth may prove the "carrying" element either with evidence that the defendant carried a firearm in a vehicle or concealed a firearm on or about his person. *Id*. In this case, the Commonwealth furnished circumstantial proof that the Appellant concealed a firearm on or about his person in the time prior to the execution of the search warrant. Proof of concealment of a firearm on the defendant's person depends on the particular circumstances of the case and is a question for the trier of fact. *Commonwealth v. Scott*, 436 A.2d 607, 608 (Pa.1981).

"The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." *Commonwealth v. Brown*, 23 A.3d 544, 559-560 (Pa. Super. 2011) (*enbanc*).

23

Here, the jury concluded based on the evidence presented that the Glock 23 handgun was thrown down the basement steps by the Appellant as the Narcotics Task Force executed the search warrant. The DNA on the Glock 23 matched the Appellant. The DNA on the Glock handgun did not match John Moreno's DNA. The handgun was found clean at the bottom of the cellar staircase in a cellar that was filthy dirty from which one could reasonably infer the firearm was recently thrown there. Further, there was a "skid" mark on the floor in the area where the handgun was alleged to have struck the filthy basement floor when thrown in haste down the basement. The contraband was located just short of the handgun.

This court concludes, as in the cases[19] where handguns inside a vehicle are found within reach of a defendant, the evidence is sufficient to demonstrate possession of the firearm. In this case the Glock 23 handgun certainly was within reach of the Appellant, should he have darted down the cellar steps where he threw the gun in an attempt to conceal and distance himself from the firearm he knew he was not to possess.

---

[19] Proof of partial concealment ... is sufficient to demonstrate that the defendant carried a firearm on his person. *See Commonwealth v. Butler*, 150 A.2d 172, 173 (Pa. Super.1959) (evidence of concealment sufficient where defendant carried gun in pocket; fact that part of gun was visible to witnesses did not undermine conviction). Also, The Commonwealth can prove that the defendant carried a firearm inside a vehicle through evidence of either actual or constructive possession. *See Commonwealth v. Hopkins*, 67 A.3d 817, 821 (Pa. Super.2013) (evidence was sufficient to show that defendant constructively possessed firearm found in vehicle he was driving, as required to support convictions for carrying a firearm without a license; firearm was found within arms length of where defendant was seated).

For all of the foregoing reasons, Appellant's challenge to the sufficiency of the evidence of his possession of a firearm without a license is devoid of merit.

II. Under the totality of the circumstances, the evidence at trial sufficiently, clearly, convincingly and beyond a reasonable doubt demonstrated the Appellant promoted, facilitated, conspired with others and planned and solicited the crime of Possession with Intent to Deliver Heroin, and therefore, Appellant's various sufficiency challenges must fail. Appellant's conviction should be affirmed.

The Appellant raises the following challenges to his Possession with Intent to Deliver Heroin conviction as follows:

(7) Insufficiency of the *evidence of the Appellant's promotion of or facilitation* of Conspiracy to PWID with another person to sustain his conviction for Conspiracy to PWID;

(8) Insufficiency of the *evidence of the Appellant's agreement with others* to sustain his conviction for Conspiracy to PWID;

(9) Insufficiency of the *evidence of the Appellant's agreement with another to aid in the planning, committing, attempting or soliciting* the crime to sustain his conviction for Conspiracy to PWID.

The Pennsylvania Superior Court determines whether, when viewed in the light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crime charged is established beyond a reasonable doubt when reviewing sufficiency challenges. *See Commonwealth v. Brown*, 23 A.3d 544, 559 (Pa. Super. 2011) (en banc). "The Commonwealth may sustain its burden of proving every

25

element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Id.* (quoting *Commonwealth v. Hutchinson*, 947 A.2d 800, 805-06 (Pa. Super. 2008)).

To sustain a conviction for possession of a controlled substance with intent to deliver, the Commonwealth must establish the defendant knowingly or intentionally possessed a controlled substance without being properly registered to do so, with the intent to manufacture, distribute, or deliver it. See 35 P.S. § 780–113(a)(30); *Commonwealth v. Brown*, 48 A.3d 426, 430 (Pa.Super. 2012).

The Commonwealth was required to establish that Appellant had, at least, constructive possession. *Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa.Super. 2013). To establish constructive possession of contraband, the Commonwealth must show that the defendant has "conscious dominion" over the contraband, that is, "the power to control the contraband and the intent to exercise that control." *Brown*, 48 A.3d at 430 (quoting *Commonwealth v. Parker*, 847 A.2d 745, 750 (Pa.Super. 2004)). The "intent to maintain a conscious dominion may be inferred from the totality of the circumstances," and "constructive possession may be found in one or more actors where the item in issue is in an area of joint control and equal access." *Commonwealth v. Johnson*, 26 A.3d 1078, 1094 (Pa. 2011).

Instantly, the evidence of Appellant's guilt for committing the crime of Possession with Intent to Deliver is overwhelming. Through surveillance, controlled

26

purchases, execution of a duly authorized search warrant and the evidence and testimony at trial, members of the Delaware County Narcotics and Drug Task Force uncovered the heroin distribution network Appellant was operating from the row home at 1102 Thomas Street in Chester, Delaware County.

The Commonwealth elicited expert testimony at trial that highlighted and underscored that Appellant was the head of the heroin distribution operation at 1102 Thomas Street. The Appellant offered no rebuttal or critical attack on Detective Bannar's testimony. Additionally, expert DNA evidence was produced that connected the Appellant to the Glock 23 handgun discovered on the premises in proximity to the Appellant as well as the heroin. The Appellant had thousands of dollars in his pocket when searched incident to his arrest which was, of course, bundled in the same rubber bands used to bundle the heroin baggies that were seized at the scene. Importantly, the DNA evidence not only tended to implicate the Appellant but ruled-out the Appellant's co-conspirator, John Moreno, as the possessor of the Glock 23 handgun.

In his testimony, Detective Bannar pointed out that pit bull dogs are utilized as guards and protection for the illegal operations. Here, dog feces were littered about the basement where the Glock 23 handgun and 92 baggies of bound heroin were found. There was evidence of "branding" with the name "Need for Speed" stamped on the heroin baggies.

27

Also, there was expert testimony as to the hierarchy as between Appellant and John Moreno, the other individual present on the premises when the search warrant was executed. The Commonwealth's expert opined that the Appellant was higher on the heroin distribution ladder than Moreno and evidence proved as much, where Appellant possessed Thousands of Dollars in his pocket and Moreno possessed materially less money and was in possession of only four (4) baggies of heroin all of which tended to corroborate that Moreno was a street dealer for Appellant's heroin.

In his challenge to the sufficiency, Appellant appears to take issue with the evidence of the conspiracy in this case, compelling this court to examine the evidence of conspiracy elicited at trial.

Section 903 of the Pennsylvania Crimes Code sets forth the crime of conspiracy as follows:

(a) Definition of conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime. 18 Pa.C.S. § 903.

*"To sustain a conviction for criminal conspiracy, the Commonwealth must establish the defendant: 1) entered into*

28

*an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy."* Commonwealth v. Devine, *2011 PA Super 163, 26 A.3d 1139, 1147 (Pa. Super. 2011). "The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt."* Id. *The conspiratorial agreement "can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode."* Id. Commonwealth v. Feliciano, *67 A.3d 19, 25-26 (Pa. Super. 2013).*

In this case, the jury chose to believe that the operation being run from 1102 Thomas Street in Chester Delaware County was a heroin enterprise, from which heroin was being stashed and "trapped". In the 1102 Thomas Street row house, heroin was bundled, sold, and possessed for branding, packaging, and sale on the streets. The Appellant's possession of the Glock 23 handgun, evidence of the guard dog, the thousands of US Dollars in his pocket bound in the same rubber bands as used in the bundling of the heroin, the bagging materials, the actual bundled 92 wax baggies, the branding, the fact that there were no indicia of personal use and all of the evidence at trial set forth all of the evidence of promotion, facilitation, agreement, common plan and overt acts[20] necessary to sustain conviction for

---

[20] The conviction for conspiracy is plain here as the evidence of agreement is obvious, a shared purpose and an overt act. The Appellant acted with the intent of promoting or facilitating the commission of the offense. *Commonwealth v. Allen,* 625 A.2d 1266, 1268 (Pa. Super. 1993).

29

Possession with Intent to Deliver heroin. It is clear the jury properly accepted the testimony of the law enforcement officers, police drug distribution experts, and a DNA expert who testified on behalf of the Commonwealth. The quantity of heroin seized, together with the fact there was no drug paraphernalia necessary for use, as well as the expert testimony that a user would have the heroin on his person along with syringes or needles, made the entire scene inconsistent with any "personal use" defense.

Therefore, the facts and circumstances here, taken in a light most favorable to the Commonwealth as the verdict winner, were sufficient to sustain the Appellant's convictions for PWID and related offenses. The testimony and evidence at trial established that the quantity of heroin was not for personal use but was possessed with the intent to deliver on the streets.

CONCLUSION

For all the foregoing reasons, the Appellant's Judgment of Sentence should be affirmed.

BY THE COURT:

RICHARD M. CAPPELLI, J.

30